Slip Op. 17-146

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
MAVERICK TUBE CORPORATION,           :
                                     :
                  Plaintiff,         :
                                     :
        v.                           :
                                     :    Before: Richard K. Eaton, Judge
UNITED STATES,                       :
                                     :    Court No. 15-00303
                  Defendant,         :
                                     :
        and                          :
                                     :
SEAH STEEL CORPORATION,              :
                                     :
                  Defendant-Intervenor. :
———————————————————— :

## OPINION

[Plaintiff Maverick Tube Corporation's motion for judgment on the agency record is denied, and the United States Department of Commerce's final negative countervailing duty determination is sustained.]

Dated:  October 27, 2017

*Robert E. DeFrancesco* and *Brett A. Shumate*, Wiley Rein, LLP, of Washington, DC, for plaintiff. With them on the brief were *Alan H. Price*, *Tessa V. Capeloto, Adam M. Teslik*.

*Loren M. Preheim*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Claudia Burke*, Assistant Director, and Ryan M. Majerus, Trial Attorney. Of counsel on the brief was *Khalil Gharbieh*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Daniel E. Parga*, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, for defendant-intervenor. With him on the brief was Jeffrey M. Winton.

Eaton, Judge: Before the court is Maverick Tube Corporation's ("Maverick" or "plaintiff")

motion for judgment on the agency record challenging the final determination of the United States

Department of Commerce ("Commerce" or the "Department") in *Welded Line Pipe From the Republic of Korea: Final Negative Countervailing Duty Determination*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015), P.R. 457 and accompanying Issues and Decision Memorandum, P.R. 450 ("Final Determination").

Plaintiff objects to the Final Determination on three grounds, claiming that (1) Commerce acted contrary to law by concluding that the Government of the Republic of Korea's ("Korean Government") provision of electricity to defendant-intervenor SeAH Steel Corporation ("SeAH") did not benefit the company; (2) Commerce's conclusion that the Korean Government's provision of electricity did not benefit SeAH was unsupported by substantial evidence; and (3) Commerce's determination not to apply adverse facts available[1] ("AFA") to the Korean Government was unsupported by substantial evidence. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 32 ("Pl.'s Br.") 3. Additionally, plaintiff asks the court to "remand the issue of specificity[2] to the agency" because Commerce's failure to reach a final determination on specificity "was contingent on its unlawful and unreasonable finding of no benefit." Pl.'s Br. 4.

---

[1]     If Commerce determines that the use of facts available is warranted under 19 U.S.C. § 1677e(a), and makes the additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information," it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b) (2012); *Artisan Mfg. Corp. v. United States*, 38 CIT __, __, 978 F. Supp. 2d 1334, 1342 (2014). This is generally referred to as "adverse facts available."

[2]     Pursuant to the statute, a subsidy must be "specific" to be countervailable. *See* 19 U.S.C. § 1677(5)(A). "Specificity" may be established in several ways, one of which is by showing that a particular industry is favored over others. *See* 19 U.S.C. § 1677(5A)(D)(iii)(IV) (providing that a subsidy is specific "as a matter of fact" if "[t]he manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others").

Defendant the United States (the "Government" or "defendant"), on behalf of Commerce, argues that Commerce's determination that the Korean Government's provision of electricity "provides no benefit to [respondent] SeAH . . . because the prices charged to [SeAH] . . . were consistent with [the Korea Electricity Power Corporation's ("KEPCO")] standard pricing mechanism," is both in accordance with law and supported by substantial evidence. Final Determination at 18; *see* Def.'s Resp. Pl.'s Mot. J. Agency R., ECF No. 39 ("Def.'s Br.") 10. Specifically, defendant maintains that, under the regulatory framework, Commerce properly determined that KEPCO's electricity prices "were set in accordance with . . . market principles" based on Commerce's "analysis of the [KEPCO's] price-setting philosophy [*i.e.*, standard pricing mechanism]." Def.'s Br. 10. In addition, the Government maintains that Commerce did not apply AFA lawfully because the Korean Government "was fully cooperative" by "respond[ing] to Commerce's multiple, detailed questionnaires. . . ." Def.'s Br. 23. Defendant's papers do not address the issue of specificity. Because the Government argues that Commerce properly determined that a benefit was not conferred, however, the Government presumably believes the issue of specificity need not be addressed. This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012); 19 U.S.C. § 1516a (a)(1)(A).

Defendant-Intervenor SeAH states that defendant "has provided sufficient justification for denying Maverick's motion," and therefore, determined "it [was] not necessary . . . to explain its own views of the issues . . . or the reasons that Maverick's motion should be denied." Def.-Int.'s Resp. Pl.'s Mot. J. Agency R., ECF No. 40, 1.

Because the court finds that Commerce's Final Determination was supported by substantial evidence and in accordance with law, plaintiff's motion for judgment on the agency record is denied.

## LEGAL FRAMEWORK

A countervailable subsidy exists where "an authority [*i.e.* a government or governmental actor] . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). When the financial contribution consists of a provision of goods or services, a benefit is found when "such goods or services are provided for less than adequate remuneration," with the adequacy of remuneration determined "in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv). Examples of prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

Importantly for plaintiff, § 1677(5)(E)(iv) reflects a change in definition of what amounts to a "benefit" following the passage of the Uruguay Round Agreements Act ("URAA").[3] *See Certain Softwood Lumber Prods. From Canada*, 66 Fed. Reg. 43,186, 43,196 (Dep't Commerce Aug. 17, 2001) (preliminary affirmative countervailing duty determination). Prior to the URAA, a subsidy would have been found present when goods or services were provided "at preferential rates." 19 U.S.C. § 1677(5)(A)(ii)(II) (1988). Under the former preferentiality standard, "preferential" meant "more favorable treatment to some within the relevant jurisdiction than to others within that jurisdiction," but not that preferential treatment was necessarily "inconsistent with commercial considerations." *Countervailing Duties*, 54 Fed. Reg. 23,366, 23,372 (Dep't Commerce May 31, 1989) (notice of proposed rulemaking and request for public comments)

---

[3]        Uruguay Round Agreements Act, Pub. L. No. 103-465, § 101, 108 Stat. 4814 (codified as 19 U.S.C. § 3511 (1994)).

("1989 Proposed Rule")[4]; *see also Final Negative Countervailing Duty Determinations; Certain Softwood Prods. From Canada*, 48 Fed. Reg. 24,159, 24,167 (Dep't Commerce May 31, 1983).

Following the passage of the URAA and the adoption of the "adequate remuneration" language, Commerce concluded that it wished to "acquire some experience with the new statutory provision before codifying [its] methodology [for determining the adequacy of remuneration] in the form of a regulation." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) ("Preamble"). In 1997, Commerce sought guidance as to how to conform its regulations with the language of the URAA. *See Countervailing Duties: Proposed Rule*, 62 Fed. Reg. 8818 (Dep't Commerce Feb. 26, 1997) (notice of proposed rulemaking and request for public comments) ("1997 Proposed Rule"). In response to the 1997 request, Commerce received comments emphasizing the importance of basing the adequate remuneration benchmark on market prices that have not been distorted by a government's involvement in the market. Commerce also received comments regarding its stated intention to continue employing a preferentiality analysis when the government is the sole provider of goods or services (*e.g.*, for provisions of electricity, water, or natural gas).[5] One commenter urged Commerce to codify a

---

[4]        Although not adopted, the 1989 Proposed Rule "codif[ied] much of the Department's existing practice with respect to the identification and measurement of subsidies under the countervailing duty law." *Countervailing Duties*, 54 Fed. Reg. at 23,366.

[5]        In particular, as to the anticipated inclusion of a preferentiality-based analysis in the regulations, Commerce stated:

> We should note, however, that while "adequate remuneration" has replaced "preferential" as the standard, we do not believe this precludes us from continuing to apply certain preferentiality-based analyses we have used in the past. *See Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30949 (1992); and *Certain Fresh Cut Flowers from the Netherlands*, 52 FR 3301, 3302 (1987). There is no indication that Congress intended to change our practice with respect to government-provided goods and services such as electricity, water, or natural gas; *i.e.*, goods and services provided to a wide variety of users by a government-owned company that is usually the sole provider of the good or service.

preferentiality-type analysis for such situations; others argued that this approach would not "adequately measure the differential between the price paid for the input and the full market value of the input." Preamble, 63 Fed. Reg. at 65,377.

Thereafter, based on its experience and the comments it received, Commerce noted that "[p]articular problems can arise in applying [the adequate remuneration] standard when the government is the sole supplier of the good or service in the country or within the area where the respondent is located." *Steel Wire Rod From Trinidad and Tobago*, 62 Fed. Reg. 55,003, 55,006 (Dep't Commerce Oct. 22, 1997) (final affirmative countervailing duty determination). Commerce reached this conclusion because, when the government is the sole supplier of the good or service, "there may be no alternative market prices available" to use as a benchmark against which to measure the supplier's price. *Steel Wire Rod From Trinidad and Tobago*, 62 Fed. Reg. at 55,006; *see also Steel Wire Rod From Germany*, 62 Fed. Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997) (final affirmative countervailing duty determination). Thus, when there is no market-based benchmark to compare the government price to, Commerce found that it was necessary to "examine other options" for determining whether the goods or services were provided for adequate remuneration. *Steel Wire Rod From Germany*, 62 Fed. Reg. at 54,994.

In early investigations under the new statute, Commerce's "other options" included an examination of such factors as "whether the government has followed a consistent rate making policy, whether it has covered its costs, whether it has earned a reasonable rate of return in setting its rates, and/or whether it applied market principles in determining its rates." *Steel Wire Rod From Trinidad and Tobago*, 62 Fed. Reg. at 55,007; *see also Steel Wire Rod From Germany*, 62 Fed.

---

1997 Proposed Rule, 62 Fed. Reg. at 8836.

Case 1:15-cv-00303-RKE   Document 59   Filed 10/27/17   Page 7 of 33

Court No. 15-00303                                                    Page 7

Reg. 54,994. Commerce made it clear, however, that such considerations "in no way indicate[d] a departure from [its] preference for relying on market conditions in the relevant country . . . ." *Steel Wire Rod from Trinidad and Tobago*, 62 Fed. Reg. at 55,007.

After gaining some further experience with the adequate remuneration standard, Commerce codified its methodology. *See* 19 C.F.R. § 351.511 (1999). To conform to the URAA, and its preference for market-based benchmark prices, Commerce adopted a three-tiered, hierarchical approach for determining the adequacy of remuneration of an investigated good or service. *See* 19 C.F.R. § 351.511.

Under this methodology, Commerce generally begins by identifying a proper benchmark price, which is "the price that could have constituted adequate remuneration," and then compares that price with the government-determined price paid by respondents. *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014); *see* 19 C.F.R. § 351.511. The preferred method is to "compar[e] the government price to a market-determined price for the good or service resulting from actual transactions in the country in question" (a "tier one" benchmark analysis). *See* 19 C.F.R. § 351.511(a)(2)(i). If no useable market-determined price can be traced to actual transactions within the country, Commerce will then compare "the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question" (a "tier two" benchmark analysis). 19 C.F.R. § 351.511(a)(2)(ii). If no world market price is available to in-country purchasers, however, Commerce will then determine the adequacy of remuneration by "assessing whether the government price is consistent with market principles" (thus, Commerce's regulations provide for a "tier three" benchmark analysis). 19 C.F.R. § 351.511(a)(2)(iii).

The preamble to § 351.511 states that a tier three benchmark analysis will involve an examination of "such factors as the government's price-setting philosophy [(*i.e.*, standard pricing mechanism)[6]], costs (including rates of return sufficient to ensure future operations), or possible price discrimination." Preamble, 63 Fed. Reg. at 65,378. Notably, however, Commerce stated that it need not "put[] these factors in any hierarchy, and [it] may rely on one or more of these factors in any particular case." Preamble, 63 Fed. Reg. at 65,378. The Preamble then cites *Pure Magnesium and Alloy Magnesium From Canada* ("*Magnesium from Canada*") as an example of a useful tier three benchmark analysis for measuring the adequacy of remuneration with respect to government-provided goods or services when the government entity is the sole provider of the good or service. Preamble, 63 Fed. Reg. at 65,378 (citing *Magnesium from Canada*, 57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) (final affirmative countervailing duty determination)); *see also* 1997 Proposed Rule, 62 Fed. Reg. at 8836 ("There is no indication that Congress intended to change our practice [*i.e.*, of using the *Magnesium from Canada* analysis,] with respect to government-provided goods and services such as electricity . . . .").

In *Magnesium from Canada*, the Department found that

the first step the Department takes in analyzing the potential preferential provision of electricity—assuming a finding of specificity[7]—is to compare the price charged with the applicable rate on the power company's non-specific rate schedule. . . . If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than

---

[6]       As Commerce did in its Final Determination, the court uses the terms "price-setting philosophy" and "standard pricing mechanism" interchangeably. *See* Final Determination at 26. ("[T]he Department may rely on either the use of a standard pricing mechanism ('price-setting philosophy') or a utility company's costs . . . .").

[7]       It can be presumed that specificity, in this context, means "domestic subsidies . . . provided or required by government action to a specific enterprise or industry, or group of enterprises or industries." 19 U.S.C. § 1677(5)(A)(ii) (1988).

other industries which purchase comparable amounts of electricity, we would probably not find a countervailable subsidy.

*Magnesium from Canada*, 57 Fed. Reg. at 30,949. In other words, under the *Magnesium from*

*Canada* analysis, the Department first examines how the government-owned utility company sets

its rates and then determines whether a respondent receives a price that is better than that afforded

other companies or industries purchasing comparable amounts of electricity.

# BACKGROUND

On October 16, 2014, Maverick filed a countervailing duty petition covering imports of

welded line pipe from the Republic of Korea ("Korea") and on November 5, 2014, Commerce

initiated a countervailing duty investigation.[8] *Welded Line Pipe From the Rep. of Korea and the*

*Rep. of Turkey*, 79 Fed. Reg. 67,419 (Dep't Commerce Nov. 13, 2014) (initiation of countervailing

duty investigations). Commerce selected SeAH and NEXTEEL Co., Ltd. ("NEXTEEL") as

mandatory respondents for individual examination. The period of investigation ("POI") was from

January 1, 2013, through December 31, 2013. Commerce investigated, among other things,

whether KEPCO, a state-owned and controlled entity that supplied "substantially all of the

---

[8]        The scope of this investigation covered

> circular welded carbon and alloy steel (other than stainless steel) pipe of a kind used
> for oil or gas pipelines (welded line pipe), not more than 24 inches in nominal
> outside diameter, regardless of wall thickness, length, surface finish, end finish, or
> stenciling. Welded line pipe is normally produced to the American Petroleum
> Institute (API) specification 5L, but can be produced to comparable foreign
> specifications, to proprietary grades, or can be non-graded material.

*Welded Line Pipe From the Rep. of Korea and the Rep. of Turkey*, 79 Fed. Reg. 67,419, 67,423, App. 1.

electricity in Korea," provided respondents with a countervailable subsidy in the form of the provision of electricity for less than adequate remuneration. Final Determination at 13, 14-17.

On March 20, 2015, Commerce issued a negative preliminary determination, finding that the Korean Government and KEPCO provided producers and exporters of welded line pipe from Korea only *de minimis* countervailable subsidies.[9] *See Welded Line Pipe From the Rep. of Korea*, 80 Fed. Reg. 14,907, 14,908 (Dep't Commerce Mar. 20, 2015) ("Preliminary Determination").

Following the Preliminary Determination, the Department issued supplemental questionnaires to the Korean Government. *See* Letter from Yoon & Yang LLC to Sec'y Commerce: Resp. to the Suppl. Questionnaire, C.R. 316-322, P.R. 380-386, ECF Nos. 35-2, 34-10 (April 14, 2015) ("Suppl. Questionnaire Resp."). In order to determine how the electricity rates were set, the Department asked for copies of the applications KEPCO actually filed with the Ministry of Trade, Industry and Energy ("Trade Ministry") for the electricity tariffs in effect from January 1 through January 13 and January 14 through November 20, 2013, which the Korean Government had not provided during the Preliminary Determination.[10] Suppl. Questionnaire Resp. at 6-12. In response, the Korean Government submitted copies of the appropriate applications as well as data summaries supporting the relevant tariff increases. *See* Suppl. Questionnaire Resp. at 6-12; *see also* Suppl. Questionnaire Resp., Exs. GSQ4RE-2, GSQ4RE-4, GSQ4RE-5, GSQ4RE-

---

[9]        Under 19 U.S.C. § 1671b(b)(4)(A), if the "aggregate of the net countervailable subsidies is less than 1 percent ad valorem," then Commerce will disregard such *de minimis* countervailable subsidies.

[10]       According to answers submitted by the Korean Government in response to Commerce's supplemental questionnaires "[t]he calculation of costs provided [to Commerce during earlier responses] are KEPCO cost[s] . . . for the entire POI [*i.e.*, the entirety of 2013]." Suppl. Questionnaire Resp. at 12. Nevertheless, Commerce found that the Korean Government's supplemental questionnaire responses "provided the necessary information to be used in [Commerce's] analysis as to whether the prices are in accord with a standard pricing mechanism." Final Determination at 30.

9, GSQ4RE-10. In June, Commerce conducted a verification of the questionnaire responses. Verification Questionnaire Resp., ECF Nos. 35-2, 42, C.R. 385, P.R. 430 (Aug. 17, 2015) (summary of verification responses). Although Commerce ultimately found that the Korean Government had "adequately responded to all of the Department's detailed questions" involving its provision of electricity to the respondents, plaintiff raised several concerns involving the information the Korean Government submitted to Commerce regarding KEPCO's price-setting procedures. Final Determination at 24-26.

On October 13, 2015, Commerce issued its final negative countervailing determination. *See* Final Determination. As it had in the Preliminary Determination, the Department began its analysis by determining the proper tier under 19 C.F.R. § 351.511(a)(2) (2014). Commerce found a tier one benchmark analysis was inappropriate because KEPCO "is the primary utility company in Korea providing electricity to Korean consumers, and the [Korean Government] regulates the rates that KEPCO charges for electricity." Final Determination at 15. In other words, there was no competitive-market determined price that could provide an adequate benchmark. In addition, Commerce declined to use a tier two benchmark analysis because "[t]he [Korean Government] has stated that there is no cross-border transmission or distribution of electricity in Korea," and "the Department will only use world market prices if the good or service is actually available to the purchaser in the country under investigation." Final Determination at 16. Therefore, Commerce elected to use its "final alternative," a tier three benchmark analysis, in which "the Department will assess whether the prices charged by KEPCO are set in accordance with market principles through an analysis of such factors as KEPCO's [standard pricing mechanism], costs . . . , or possible price discrimination." Final Determination at 16.

Based on the information used by KEPCO "to develop the tariff schedules that were applicable during the POI," Commerce found that the company's prices were consistent with market principles solely through an analysis of KEPCO's standard pricing mechanism. Final Determination at 17-18. In other words, Commerce did not depend on facts otherwise available,[11] as it had in the Preliminary Determination, to determine how KEPCO set its rates, but rather it relied on questionnaire responses. Specifically, Commerce first determined how KEPCO set its rates and if they were consistent with a standard pricing mechanism. Next, the Department "examine[d] the electricity rates charged to [the] investigated respondents to determine whether the price charged is consistent with the power company's standard pricing mechanism." Final Determination at 17. Using the analysis found in *Magnesium from Canada*, Commerce found that because the rates charged to respondents were consistent with KEPCO's standard pricing mechanism, and the companies were "in all other respects essentially treated no differently than other companies and industries which purchase[d] comparable amounts of electricity," respondents received no benefit. Final Determination at 17-18 (citing *Magnesium from Canada*, 57 Fed. Reg. at 30,946). That is, Commerce first determined if KEPCO had a standard pricing mechanism and how it worked, and then examined whether this same method was employed to set the rates for respondents and other companies and industries purchasing similar amounts of electricity.

With respect to KEPCO's standard pricing mechanism, Commerce verified that the utility company developed its electricity rates based on annual cost data obtained from an independent

---

[11]     Under 19 U.S.C. § 1677e(a), if "necessary information is not available on the record" or "an interested party or any other person . . . withholds information that has been requested by the administering authority . . . or . . . provides such information but the information cannot be verified," then Commerce shall use "the facts otherwise available" in making its determination.

accounting firm that audited KEPCO's costs and calculated its annual cost of electricity. Final

Determination at 17. Those figures were later used to calculate the tariff for each customer

classification. Final Determination at 17. Thus, the Department found:

> To develop the electricity tariff schedules that were applicable during the POI,
> KEPCO first calculated its overall cost including an amount for investment return.
> This cost includes the operational cost for generating and supplying electricity to
> the consumers as well as taxes. The cost for each electricity classification was
> calculated by (1) distributing the overall cost according to the stages of providing
> electricity (generation, transmission, distribution, and sales); (2) dividing each cost
> into fixed cost, variable cost, and the consumer management fee; and (3) then
> calculating the cost by applying the electricity load level, peak level, and the
> patterns of consuming electricity. Each cost was then distributed into the fixed
> charge and the variable charge. KEPCO then divided each cost taking into
> consideration the electricity load level, the usage pattern of electricity,[12] and the
> volume of the electricity consumed. Costs were then distributed according to the
> number of consumers for each classification of electricity.

Final Determination at 17. Commerce "verified that KEPCO applied this same . . . standard pricing

mechanism to determine the electricity tariffs for each tariff classification including the industrial

tariff that was paid by the respondents during the POI" and thus found that "the [Korean

Government] provided the necessary information to be used in [the Department's] analysis as to

whether the prices are in accord with a standard pricing mechanism" pursuant to

§ 351.511(a)(2)(iii). Final Determination at 17-18, 30. Commerce also found that there was "no

information on the record that SeAH . . . [was] treated differently from other industrial users of

electricity that purchase comparable amounts of electricity." Final Determination at 18. Next, the

Department rejected plaintiff's arguments that the Korean Government did not cooperate with

---

12    For instance, if a classification consumed most of its electricity at night when
demand was low, it would be charged less. *See Detailed Approval Standards for Power Generation
Business, Standards for Calculation of Electricity Charges, Tolerance of Electricity Meters and
Electric Power System Operation* (Apr. 1, 2012), ECF No. 42, Art. 9(2) ("In principle, the
electricity charges consist of basic charges, electricity volume charges and fuel cost adjustment
charges.").

Commerce and that AFA should therefore be applied because Commerce found that the Korean Government had not failed to cooperate to the best of its ability in the proceeding. Final Determination at 29 ("The [Korean Government] adequately responded to all of the Department's extensive and detailed questions in its responses . . . . Our detailed supplemental questions on electricity were not the general result of the [Korean Government's] unwillingness to respond to our questions but rather, were due to the complicated nature of an analysis of market principles required under the 19 CFR 351.[5]11(a)(2)(iii). Therefore, we disagree with the petitioner's argument that the [Korean Government] has prevented or forestalled the Department's attempt to collect the appropriate information to conduct an analysis under 19 CFR 351.[5]11(a)(2)(iii).").

As a result, Commerce found that "consistent with 19 CFR 351.511 and *Magnesium from Canada* . . . [KEPCO's] program provides no benefit to SeAH . . . because the prices charged to [SeAH] under the applicable industrial tariff were consistent with KEPCO's standard pricing mechanism" and thus, that the Korean Government provided no countervailable subsidy. Final Determination at 18.

This action followed.

### STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is defined as 'more than a mere scintilla,' as well as evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

# DISCUSSION

I. **COMMERCE'S DETERMINATION THAT THE KOREAN GOVERNMENT'S PROVISION OF ELECTRICITY DID NOT BENEFIT RESPONDENTS IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE**

### A. Commerce's Use of the Standard Pricing Mechanism Analysis was in Accordance with Law

Plaintiff's primary argument is that Commerce, in reaching its determination, unlawfully relied on a factor "'which Congress has not intended it to consider.'" Pl.'s Br. 24 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Specifically, plaintiff argues that Commerce's use of the standard pricing mechanism analysis found in *Magnesium from Canada* merely "measured price discrimination," and thus, only demonstrated that the Korean Government did not "provide electricity at 'preferential' rates." Pl.'s Br. 23. According to plaintiff, by "limit[ing] its examination to whether prices were consistent with KEPCO's standard pricing mechanism . . . Commerce failed to meaningfully consider the question posed by the statute," (*i.e.*, whether the Korean Government received adequate remuneration for its electricity) and therefore unlawfully "equated the lack of preferentiality with adequate remuneration." Reply Br. Pl.'s ("Pl.'s Reply Br.") 2, 4.

Plaintiff maintains that Commerce was required by the statute to do more. It insists that although "Congress had amended the [Tariff] Act to replace the former 'preferential' standard with the current 'adequate remuneration' standard," the *Magnesium from Canada* determination, which Commerce relied upon, is bad precedent because it was decided prior to the statutory amendment. Pl.'s Br. 24. ("When Commerce issued its determination in *Magnesium from Canada*, the Act provided that subsidies include '[t]he provision of goods or services at preferential rates.'" (citing 19 U.S.C. § 1677(5)(A)(ii)(II) (1988))). For Maverick, the statutory amendment providing for "adequate remuneration" requires Commerce to analyze whether government prices are "market-

based"—a determination plaintiff asserts cannot be made solely by examining whether

respondents received a rate outside of what it would have received if the rate were set by the

standard pricing mechanism. *See* Pl.'s Reply Br. 3, 6 ("[A] lack of preferential pricing in and of

itself does not show that prices are market based."). Thus, according to Maverick, Commerce's

use of the standard pricing mechanism analysis "elevates a single citation in the [Preamble] above

what is required by the statute" and "eliminates the distinction between the preferentiality standard

and the adequacy of remuneration standard." Pl.'s Reply Br. 3, 6.

For Commerce, however, "[d]etermining whether a government-set price for electricity is

in accordance with market principles by examining whether the electricity prices are set using the

utility company's standard pricing [mechanism] is consistent with [its] regulations and precedent."

Final Determination at 23 (citing Preamble, 63 Fed. Reg. at 65,378). As for the URAA's change

to the adequate remuneration standard, defendant maintains Commerce's regulations found at 19

C.F.R. § 351.511 complied with the statute because the regulation "flipped the regulatory

hierarchy, with market prices from the country under investigation and world market prices

moving up the hierarchy, and other considerations, including price discrimination, remaining

potentially relevant only if the preferred data are unavailable." Def.'s Br. 20. In other words, for

Commerce, what constitutes adequate remuneration depends on the nature of the marketplace, and

where the marketplace is a government-controlled monopoly, there is a role for a preferentiality-

based test.

Defendant then contends that, contrary to plaintiff's characterization, the concept

developed in *Magnesium from Canada* was "an analytical methodology distinct from simple price

discrimination." Def.'s Br. 21; *see also* Final Determination at 23 ("The petitioner misinterprets

19 CFR 351.511 regarding the benefit analysis of the government provision of a good or service.").

Defendant argues that the standard pricing mechanism analysis was created "to account for the commercial market conditions by which electricity is provided to consumers," by implicitly recognizing that "electricity tariffs are generally based upon the type and amount of consumption of electricity and that utility rates vary depending on the size and classification of the electricity consumer." Def.'s Br. 22; *see also* Final Determination at 17 n.79 ("The principle of the standard pricing mechanism recognizes the commercial and market practices and conditions for the provision of electricity."). Thus, factors such as amount of electricity consumed and the time of day that it is consumed can affect the price of electricity where a government monopoly controls the supply.

The Department also insists that it took into account acquisition costs, specifically finding that

> [t]he petitioner is correct that we did not request the cost information from KEPCO's generating subsidiaries. This information was not requested because the information from the generating subsidiaries was not relevant to our analysis. Electricity generators, including subsidiaries of KEPCO, sell electricity to the Korea Power Exchange [("KPX")] and KEPCO purchases the electricity that it distributes to all of its customers from KPX. . . . Therefore, the cost of this electricity is identical for all the tariff classes (residential, general, industry, etc.) within Korea. The cost of electricity is based upon the purchase price of electricity from the KPX; therefore, this is the cost that is relevant for determining whether KEPCO's industrial tariff schedule is developed using a standard pricing mechanism. We also note that the cost data underlying the tariff rate calculations were prepared by an independent accounting firm.

Final Determination at 23-24; *see also* Def.'s Br. 18 ("KEPCO's costs for electricity are based upon the purchase price from the Korea Power Exchange, which is the cost that was relevant to Commerce's evaluation of whether the power company's rates were developed using a standard pricing mechanism.").

In addition, Commerce claims that the standard pricing mechanism analysis is in accord with the adequate remuneration standard found in the statute. According to defendant, its

*Magnesium from Canada* analysis works as follows: first, the Department determines whether the government's standard pricing mechanism is in accordance with market-principles, and second, it considers whether the respondents are treated any differently from other consumers. *See* Transcript of Oral Argument at 13-14, Maverick Tube Corp. v. United States (No. 15-00303). Therefore, defendant argues that it is wrong to simply call Commerce's approach a preferentiality test. *See* Def.'s Br. 21.

The court finds that (1) Commerce's regulation is a reasonable interpretation of the statute and (2) the Department lawfully interpreted its regulation to determine the adequacy of remuneration for the electricity provided to respondents during the POI.

"When reviewing Commerce's construction of the trade statute, this Court is directed by the two-step framework set forth by *Chevron*." *Xiping Opeck Food Co. v. United States*, 38 CIT __, __, 34 F. Supp. 3d 1331, 1342 (2014) (citing *Fine* Furniture, 748 F.3d at 1369); *see also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1983). The first step requires the court to determine whether Congress' intent under the statute is clear. *Chevron*, 467 U.S. at 842-43; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). If Congress' intent is clear, the court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Should the court determine that Congress has not directly addressed the question at issue, that is, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (footnote omitted). Under this second step, provided that

Case 1:15-cv-00303-RKE   Document 59   Filed 10/27/17   Page 19 of 33

Commerce's construction of the statute is reasonable, it will be found to be in accordance with law. *See United States v. Eurodif S.A.*, 555 U.S. 305, 317 (2009).

Here, the court finds Commerce's interpretation of the statute—namely, that when a government is the sole, or nearly sole, provider of a good or service, Commerce may determine the adequacy of remuneration through its standard pricing mechanism analysis (including use of a preferentiality-based test)—to be a reasonable construction of the statute.

As an initial matter, despite plaintiff's arguments to the contrary, Congress' intent in adopting the URAA amendment is unclear as to the proper method for determining the adequacy of remuneration. Section 1677(5)(E) simply states that the adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E). The statute then gives a non-exhaustive list of "prevailing market conditions," which include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* Aside from this list of conditions, the statute gives no guidance as to how the Department should interpret the adequacy of remuneration language. It is worth noting, however, that cost of production is absent from the list.

An examination of the Statement of Administrative Action ("SAA")[13] accompanying the URAA reveals that 19 U.S.C. § 1677(5)(E)'s language comes almost verbatim from the guidelines

---

[13]     The SAA, which "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the [URAA]," 19 U.S.C. § 3512(d), states:

> Article 14 of the Agreement sets guidelines for methods used to calculate benefit. . . . The guidelines set out in Article 14 are that: . . . the provision of goods or services . . . by a government confers a benefit where the provision is made for less than adequate remuneration . . . with the adequacy of remuneration determined in relation to prevailing market conditions for the good or service in question in the

set out in Article 14 of the Subsidies Agreement, a part of the Uruguay Round Agreement. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, at 912-13 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4239. Therefore, while the source of the adequacy of remuneration language is known, neither the statute, nor the SAA gives guidance as to Congress' intent when the words were enacted. Nor does there appear to be any legislative history that provides guidance.

Once it has been established that the definition of "adequate remuneration" is unclear, step two of *Chevron* comes into play. Under step two, the court must determine whether Commerce's construction of the statute is reasonable. *See Chevron*, 467 U.S. at 843.

The court finds that Commerce's construction of the statute is reasonable. In a state-controlled monopolistic market, it is reasonable to determine the adequacy of remuneration by first examining how the state sets its rates, as the state (and not necessarily supply-and-demand)[14] controls price and availability. If the state does use a standard pricing mechanism to set its rates (*i.e.*, if its prices are set by a consistent discernable method), it is also reasonable for Commerce to determine the adequacy of remuneration by examining whether respondents received a preferential rate when compared to those entities receiving a rate set by the standard pricing mechanism.

As noted, the statute directs Commerce to determine if a benefit is present by determining whether a good or service is provided "for less than adequate remuneration." Adequate remuneration is to be measured by "prevailing market conditions . . . in the country which is subject

---

country of provision or purchase (including price, quality, availability, marketability, transportation, and other conditions of purchase or sale).

SAA, at 912-13.

[14]     The provision of electricity, in particular, is often subject to state control. *See, e.g.*, N.Y. POWER AUTH., ANNUAL REPORT 53 (2015).

to the investigation or review." 19 U.S.C. § 1677(5)(E). The statute does not direct Commerce to

create a fictional model market or (as shall be seen) to audit KEPCO's books to determine if it

covers its costs. The statute directs Commerce to judge the adequacy of remuneration based on

market conditions that actually exist in Korea. That the Korean electricity market is controlled by

a state run monopoly does not change the statute.

The court, moreover, is unconvinced that simply because *Magnesium from Canada* was

guided by a different statutory standard, its standard pricing mechanism analysis cannot be used

to determine the adequacy of remuneration under a tier three benchmark analysis. Although the

statutory change marked a departure from defining a benefit in terms of preferentiality, that does

not mean that *Magnesium from Canada*'s standard pricing mechanism analysis is not relevant to

determine the adequacy of remuneration when market-based prices are unavailable. There is no

evidence in the legislative history that Congress intended the dramatic change in law plaintiff

suggests. In fact, the legislative history seems to indicate that Congress simply chose to enact the

language contained in the Uruguay Round Agreement.

Commerce's past experience shows that, in certain situations, preferentiality-like tests may

be useful when determining the adequacy of remuneration. *See, e.g.*, *Steel Wire Rod From

Germany*, 62 Fed. Reg. at 54,994.[15] Indeed, in a monopolistic situation, such as the electricity

market in Korea, the state-controlled market provides the only source from which Commerce can

---

[15]        In *Steel Wire Rod From Germany*, Commerce determined that the Government of
the Free and Hanseatic City of Hamburg ("GOH"), which leased land to producers and exporters
of steel wire rod from Germany, used a "standard lease for all enterprises in the port area" and that
"[t]here are no special provisions made for different industries." *Steel Wire Rod From Germany*,
62 Fed. Reg. at 54,994. Therefore, because the respondent "pa[id] a standard rate charged by the
GOH to all enterprises leasing land similar to [respondent's], and because these prices are set in
reference to market conditions, [Commerce] determine[d] that [respondent's] lease rate is not
countervailable." *Steel Wire Rod From Germany*, 62 Fed. Reg. at 54,994.

obtain a price. That is, in situations involving the state-controlled provision of electricity, finding that electricity rates are based on a standard pricing mechanism and then examining if a company or industry receives a preferential rate is a reasonable way to determine whether a state-controlled supplier received adequate remuneration.

Plaintiff spends a great deal of time in its papers claiming that Commerce unlawfully applied a preferential analysis in reaching its determination. In doing so, plaintiff appears to argue that Commerce was somehow prohibited from assembling information as to whether the respondents were charged less for their electricity than other consumers. Why this should be the case is a bit of a mystery. Should it have developed that respondents were paying less than others similarly situated for the provision of electrical service, this would be evidence that the rate paid by respondents was not arrived at by the application of KEPCO's standard pricing mechanism (*i.e.*, that the rate was not based on the electricity "market" in Korea). In other words, plaintiff's assertions fail to consider that Commerce first examined how the rates were set, and only then asked if the market-based rates (albeit a monopolistic market) were calculated the same as the rates respondents paid for electricity. Merely because Commerce employed an analysis it used for other purposes elsewhere to make this comparison does not (1) prohibit Commerce from collecting evidence of the existence (or lack thereof) of a cheap rate for respondents or (2) prohibit Commerce from using this information to make a determination as to whether respondents' rate was set by the principles used to determine the rate of others purchasing electricity in the Korean market.

Plaintiff also maintains that Commerce's explanation for its determination "is insufficient and patently unreasonable." Pl.'s Br. 30. The court, though, agrees with the defendant that Maverick "cannot substitute [various third party reports] for the benchmark analysis Commerce is required to perform pursuant to 19 C.F.R. § 351.511(a)(2)." Def.'s Br. 22. Here, Commerce found

that KEPCO's standard pricing mechanism was developed based on its annual cost data as

calculated by an independent accounting firm. Final Determination at 17. In addition, Commerce

found that KEPCO used these figures to "calculate the tariff for each customer classification"

based on standard methodologies set forth in the standards for calculation of electricity charges

issued by the Korean Ministry of Knowledge Economy. Final Determination at 17 (citing *Detailed*

*Approval Standards for Power Generation Business, Standards for Calculation of Electricity*

*Charges, Tolerance of Electricity Meters and Electric Power System Operation* (Apr. 1, 2012),

ECF No. 42). Commerce then found that KEPCO applied this same standard pricing mechanism

to determine respondents' tariff rates and that respondents were not treated any differently from

"other industrial users of electricity that purchase comparable amounts of electricity." Final

Determination at 18. Finally, as Commerce noted in its Final Determination, "[t]he principle of

the standard pricing mechanism recognizes the commercial and market practices and conditions

for the provision of electricity." Final Determination 17 n.79. In other words, under the tier three

benchmark analysis Commerce takes the market as it finds it, even if it is, for all practical purposes,

a monopoly.

Accordingly, the court holds that Commerce's construction of the statute—that Commerce

may determine the adequacy of remuneration based on the standard pricing mechanism analysis

developed in *Magnesium from Canada*—is reasonable, and thus, in accordance with law.

## B. Commerce's Interpretation of "Adequate Remuneration" was in Accordance with Law

Maverick's second, and related, argument is that the Department's interpretation of

"adequate remuneration" is not in accordance with law. Pl.'s Br. 20. Specifically, plaintiff

maintains that Commerce "erred in its interpretation of 'adequate' because failing to recover costs

can never be adequate." Pl.'s Br. 20. In support of its position, plaintiff cites to *Webster's II New*

*College Dictionary*, which defines "adequate" as "able to satisfy a requirement" and "remunerate" as "to pay one for goods provided, services rendered, or losses incurred." Pl.'s Br. 21 (quoting *Webster's II New College Dictionary* (2001)). Plaintiff maintains that, in accordance with these definitions, the plain meaning of § 1677(5)(E) requires that adequate remuneration mean, at a minimum, that "the seller is able to cover its costs to provide a good." Pl.'s Br. 21.

The court, however, finds that defendant's interpretation of "adequate remuneration" is in accordance with law. Although plaintiff argues that Commerce misinterpreted the statute, the real thrust of its argument is that Commerce did not look at the right information. Specifically, plaintiff seems to argue that the only appropriate way to determine the adequacy of remuneration in this case would be to examine KEPCO's suppliers' costs. *See, e.g.*, Pl.'s Br. 22 ("[W]ithout a complete cost build up from Korean electricity generators, beginning with fuel costs, there was no way for the Department to determine whether [KEPCO's] prices were set according to market principles."). As discussed previously, however, the preamble to § 351.511 reasonably provides that Commerce may look solely at a government's price-setting philosophy (*i.e.*, its standard pricing mechanism) under a tier three benchmark analysis. Preamble, 63 Fed. Reg. at 65,378 ("Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs . . . or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.").

Indeed, § 351.511 accomplishes the post-URAA preference for market-based prices through its hierarchical approach. When market-based prices (*i.e.*, prices derived from actual transactions in the country under investigation or available on the world market) are available,

Commerce must compare the government price to these benchmarks. *See* 19 C.F.R.

§ 351.511(a)(2)(i)-(ii). When the government is the "sole supplier of a good or service," however,

three factors are useful in determining whether a government provision of goods or services is

provided for less than adequate remuneration: the standard pricing mechanism, costs, and possible

price discrimination. Preamble, 63 Fed. Reg. at 65,378. Here, Commerce reasonably examined

KEPCO's standard pricing mechanism and found that the Korean Government received adequate

remuneration for its electricity because it determined the respondent's rate in the same manner it

did other industrial consumers.

While these prices were not set by what would normally be thought of as free market

principles (*i.e.*, prices set by supply and demand), they were not the result of guesswork. In this

case, the "market" is not some hypothetical world market for electricity or even an imagined

regional one. Rather, it is the actual market for electricity in Korea. Accordingly, Commerce

verified how KEPCO developed its electricity tariffs during the POI:

> KEPCO first calculated its overall cost including an amount for investment return.
> This cost includes the operational cost for generating and supplying electricity[16]
> to the consumers as well as taxes. The cost for each electricity classification was
> calculated by (1) distributing the overall cost according to the stages of providing
> electricity (generation, transmission, distribution, and sales); (2) dividing each cost
> into fixed cost, variable cost, and the consumer management fee; and (3) then

---

[16]     As Commerce later clarified in its Final Determination,

[e]lectricity generators, including subsidiaries of KEPCO, sell electricity to the
KPX and KEPCO purchases the electricity that it distributes from the KPX. . . .
Therefore, the cost of this electricity is identical for all the tariff classes . . . within
Korea. Although [Maverick] is correct that the [Korean Government] did not
provide the individual generating costs for KEPCO's generating subsidiaries, the
Department did not request this information. The costs for electricity are based
upon the purchase price of electricity from the KPX; therefore this is the cost that
is relevant for determining whether KEPCO's industrial tariff schedule is
developed using a standard pricing mechanism.

Final Determination at 27.

> calculating the cost by applying the electricity load level, peak level, and the
> patterns of consuming electricity. Each cost was then distributed into the fixed
> charge and the variable charge. KEPCO then divided each cost taking into
> consideration the electricity load level, the usage pattern of electricity, and the
> volume of the electricity consumed. Costs were then distributed according to the
> number of consumers for each classification of electricity.

Final Determination at 17. Commerce verified that KEPCO's annual costs were calculated by an

independent accounting firm. Final Determination at 17. Thus, although Commerce itself did not

make a detailed analysis of KEPCO's costs, it verified KEPCO's costs and how they were used to

set the rates.

Commerce then focused on whether respondents were treated the same as other industrial

consumers. The Department found that respondents were not "treated differently from other

industrial users of electricity that purchase comparable amounts of electricity," and they were

charged in accordance with KEPCO's standard pricing mechanism. Final Determination at 18.

Commerce then reasonably determined that KEPCO's prices reflected the Korean electricity

market, and thus, that respondents were not receiving a better price than other consumers in the

Korean market.

Plaintiff insists, however, that the Department was required to determine if the price

respondents paid covered the costs to provide electricity in all market conditions. Pl.'s Br. 21-22.

Not only is this finding not directed by the dictionary definitions of "adequate" and "remuneration"

plaintiff provides in its papers (*i.e.*, "able to satisfy a requirement" and "pay one for goods provided"

does not equal cover costs), but it is elemental that the functioning of a free market guided by the

law of supply and demand sometimes results in sales below cost. Since covering costs would not

be required in a tier one or tier two benchmark analysis, it is difficult to see how it should be

required here.

Accordingly, Commerce's interpretation of "adequate remuneration," namely, that in a tier three benchmark analysis, the adequacy of remuneration may be determined by taking into account a standard pricing mechanism analysis, was reasonable and thus in accordance with law.

### C. Commerce Has Supported its Benefit Analysis with Substantial Evidence

Plaintiff argues that "Commerce failed to provide a satisfactory explanation for concluding that Korean electricity prices are set in accordance with market principles" as required by 19 C.F.R. § 351.511(a)(2)(iii). Pl.'s Br. 28. Specifically, plaintiff contends that, because there is record evidence that KEPCO's electricity tariffs were not set by supply and demand and may be below cost, there are therefore "significant pricing distortions throughout the Korean electricity market." Pl.'s Br. 28. For plaintiff, Commerce must explain why such evidence does not undermine its determination that the KEPCO's prices were set in accordance with market principles under the regulation. Pl.'s Br. 30. Accordingly, plaintiff argues that Commerce's conclusion unlawfully "'suggest[s] a result contrary to clear weight of the evidence'" and thus is not supported by substantial evidence. Pl.'s Br. 18 (quoting *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987)).

Maverick bases this argument on the results of a 2013 Korean National Assembly report, which found that KEPCO sells electricity for less than cost. Pl.'s Br. 29 ("'The government subsidizes and charges less-than-normal electricity cost to the steel industries for their exceeding use of electricity. . . . The 100 biggest corporations [in Korea] are using over KRW 9 trillion worth of discounted industrial scale electricity. . . . There are huge losses because of discounted industrial electricity consumption.'" (quoting Initial Questionnaire Resp., C.R. 76, P.R. 127, ECF. No. 35-2 (Jan. 21, 2015) Ex. E-4)). Plaintiff also supports its argument by referencing the Korean Board of Audit and Inspection report, which stated that KEPCO's electricity tariffs for industrial use covered only 85.8 percent of its production costs. Pl.'s Br. 29 (citing Petition for Imposition of

Antidumping and Countervailing Duties, C.R. 1-28, P.R. 1-28, ECF No. 35-2 (Oct. 16, 2014) Ex.

IV-49). Maverick then notes that some record evidence indicates that KEPCO itself has conceded

that it sells electricity at a loss. Pl.'s Br. 30 ("'The distortion of the energy price structure resulting

from the less-than-cost electricity prices has rapidly increased electricity consumption in place of

petroleum or gas, which has resulted in record high electricity consumption peaks in winter seasons

since 2009.'" (quoting Suppl. Questionnaire Resp., Ex. GSQ4RE-4)).

      Finally, Maverick adds that the Korean Government's "failure to provide and Commerce's

refusal to request data regarding KEPCO's actual costs of generating electricity" undermines its

conclusion that the cost of electricity is identical for all classes of consumers and for Commerce

"to conclude that the only relevant question is the price at which KEPCO purchased the electricity

from its affiliate, the KPX, wholly ignores the fact that KEPCO's subsidiaries generated the

electricity, which KEPCO is reselling at a loss." Pl.'s Br. 31, 33. Therefore, plaintiff argues that

Commerce's determination is not supported by substantial evidence.

      In response, the Government argues that Commerce verified that KEPCO developed its

electricity tariff schedules during the POI based on (1) the company's annual cost data, as audited

and calculated by an independent accounting firm, and (2) Korea's standard methodology for

establishing electricity tariffs. Def.'s Br. 13 (citing Final Determination at 17). Defendant then

notes that Commerce also verified that this same standard pricing mechanism was applied during

the POI. Accordingly, defendant argues that, using the factors found in 19 C.F.R.

§ 351.511(a)(2)(iii) and the Preamble, substantial evidence supported Commerce's determination

that the prices were set in accordance with market principles. Def.'s Br. 15-16.

      Also, as has been noted, defendant maintains that Commerce did not ignore costs in its

analysis. Def.'s Br. 17. Specifically, the Government contends that "KEPCO developed its

electricity tariff schedules based on the company's annual cost data, as audited and calculated by an independent accounting firm, and an amount for investment return . . . [and] Commerce explained that it relied on the cost data underlying KEPCO's standard price calculations because they were prepared by an independent accounting firm, which served to support their accuracy." Def.'s Br. 17 (citing Final Determination at 17, 28, 30 n.132). Therefore, in Commerce's view, the use of numbers overseen by an independent accounting firm as part of KEPCO's standard pricing mechanism established that the electricity tariffs would capture KEPCO's costs, even if Commerce did not actually audit the numbers provided. *See* Def.'s Br. 17.

Defendant further argues that "Commerce did not ignore the reports [cited by plaintiff]; rather, it utilized and referred to multiple reports in its summary of background information in the [Final Determination]." Def.'s Br. 22. The Government then notes that Commerce reviewed the Korea National Assembly report on KEPCO, but found that respondents were not among the companies for which KEPCO reported losses. Def.'s Br. 23 (citing Final Determination at 14, 23). In other words, Commerce did not find this evidence as convincing as plaintiff.

As to Commerce's decision not to request cost information from KEPCO's electricity-generating subsidiaries, defendant insists that this information "was not relevant" to its analysis because KEPCO's subsidiaries "sold electricity to the [KPX], which then sold KEPCO nearly all of the electricity it distributed." Def.'s Br. 17-18 (citing Final Determination at 23-24). Put another way, for defendant, the relevant cost associated with KEPCO's standard pricing mechanism was the purchase price paid to KPX, not electricity-generation costs. Def.'s Br. 18. Therefore, defendant maintains that, by verifying the information used to develop KEPCO's rates, Commerce verified all that was required under its regulations and the preamble to § 351.511(a)(2)(iii) (*i.e.*,

that KEPCO used a standard pricing mechanism), and its determination is thus supported by substantial evidence.

The court finds that Commerce's determination was supported by substantial evidence. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369,1374 (quoting *Consol. Edison Co.*, 305 U.S. at 229). As discussed above, Commerce provided a clear explanation for why KEPCO's standard pricing mechanism was in accordance with market principles (albeit the principles of a monopolistic market), and thus, why the Korean Government received adequate remuneration. *See supra* Section I.B. Here, Commerce was able to verify that "KEPCO applied the same price-setting philosophy or standard pricing mechanism to determine the electricity tariffs for each tariff classification including the industrial tariff that was paid by [SeAH] during the POI" and further found that "there is no information on the record that SeAH . . . [is] treated differently from other industrial users of electricity that purchase comparable amounts of electricity," and thus, reasonably determined that, pursuant to § 351.511(a)(2)(iii), respondents did not receive a benefit. Final Determination at 17-18.

Although plaintiff makes arguments that the record is devoid of evidence supporting Commerce's conclusion because certain financial information could not be traced, the court notes that Commerce reasonably found that this evidence (*e.g.*, data sourced from the KEPCO Data Network[17]) was not necessary to verify the standard pricing mechanism used by KEPCO to set its electricity tariffs as required under a tier three benchmark analysis. Therefore, because

---

[17]      The KEPCO Data Network is a "statistical division within KEPCO." Verification Questionnaire Resp. at 10.

Commerce's method conformed to the law and the information Commerce relied on was fully verifiable, its determination is supported by substantial evidence.

Based on the forgoing, the court finds that the Department has cited substantial evidence that respondents did not receive a benefit by KEPCO's provision of electricity.

## II.   COMMERCE'S DETERMINATION NOT TO APPLY ADVERSE FACTS AVAILABLE TO THE KOREAN GOVERNMENT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Finally, Maverick argues that the Department's failure to apply AFA to the Korean Government is unsupported by substantial evidence and an abuse of discretion. Pl.'s Br. 43. Under 19 U.S.C. § 1677e(b), when a party fails to act to the best of its ability in responding to information requests, Commerce may apply AFA. According to Maverick, "the [Korean Government] blatant[ly] refus[ed] to cooperate to the best of its ability with Commerce's repeated requests for necessary information." Pl.'s Br. 43. Specifically, plaintiff claims that the Korean Government did not provide cost data in electronic format, did not make necessary officials available, did not provide electricity generation costs, and that it provided "insufficient, incomplete, and inconsistent questionnaire responses to Commerce." Pl.'s Br. 43.

Defendant argues that the Korean Government was "fully cooperative," and responded to Commerce's multiple and detailed questionnaires. Def.'s Br. 23. Defendant notes that "an interested party fails to cooperate to 'the best of its ability'" when it fails to "'put forth its maximum effort to provide Commerce with full and complete answers to all inquiries.'" Def.'s Br. 24 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)). Defendant emphasizes, that Commerce is "only required to verify factual information relied upon in making its final determination." Def.'s Br. 24 (citing 19 U.S.C. § 1677e(a)(2)(D)); *19* U.S.C. § 1677m(i)(1). Thus, Commerce claims that it did not rely on unverified data in making its final

determination and that it was able to verify how KEPCO set its prices based on the questionnaire

responses. Def.'s Br. 24 (citing Final Determination at 26-27, 30). Commerce states that the

Korean Government cooperated by providing the information needed to complete this verification.

Final Determination at 29-30.

With regard to the lack of electricity-generating cost information, defendant contends that

Commerce did not ask the Korean Government to provide this information, because, as has been

seen, it deemed that the information was irrelevant. Def.'s Br. 25 (citing Final Determination at

27). Next, the Government maintains that Commerce issued a substantial number of questionnaires

not because of the Korean Government's "unwillingness to respond, but rather of the complicated

nature of an analysis of market principles under 19 C.F.R. § 351.511(a)(2)(iii)." Def.'s Br. 25

(citing Final Determination at 29). Therefore, according to defendant, none of the grounds for

applying AFA pursuant to § 1677e(b) were present, and Commerce's failure to apply AFA was

supported by substantial evidence.

The court finds that Commerce reasonably determined that the use of AFA was not

required by the facts or the law. The Korean Government provided extensive answers to

Commerce's detailed and complicated questions in its January 21, 2015, March 6, 2015, March

11, 2015, April 14, 2015, and May 19, 2015 responses. *See* Final Determination at 29. Based on

these responses, Commerce was able to verify the information it actually used to reach its

determination. No interested party can be found to have failed to cooperate for not answering

questions it was not asked. Nor can a party be found to have failed to cooperate by not providing

information irrelevant to a proceeding. Accordingly, it cannot be said that the Korean Government

failed to "put forth its maximum effort to provide Commerce with full and complete answers to all

inquiries" in this investigation. *Nippon Steel Corp.*, 337 F.3d at 1382. Commerce, then, reasonably

determined it was unnecessary to apply AFA in this case.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the agency record is denied.

Judgment will be entered accordingly.


Dated:          October 27, 2017
                New York, New York


                                    _____/s/ Richard K. Eaton_____
                                         Richard K. Eaton, Judge